# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 6, 2012

## DE LANO PARKER v.
## SHELBY COUNTY GOVERNMENT CIVIL SERVICE MERIT BOARD
## and THE SHELBY COUNTY SHERIFF'S DEPARTMENT

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-09-2030-02      Arnold B. Goldin, Chancellor**

---

**No. W2012-01298-COA-R3-CV - Filed September 27, 2012**

---

Appellee corrections officer's employment with the Shelby County Sheriff's Office was terminated for appearing in a video in which he stated that he had been a gang member. The Civil Service Merit Board affirmed the termination. The officer filed a petition for judicial review in the Shelby County Chancery Court, arguing that there was not substantial and material evidence to sustain his termination and that the termination violated his First Amendment rights. The trial court ruled that the Civil Service Merit Board's decision was not supported by substantial and material evidence. We reverse the trial court's ruling that the Board's decision was not supported by substantial and material evidence, but vacate and remand to the Civil Service Merit Board for consideration of Appellee's First Amendment argument.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Reversed
in part; Vacated in part; and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and DAVID R. FARMER, J., joined.

Martin W. Zummach, Germantown, Tennessee, for the appellants, Shelby County Government and Shelby County Sheriff's Department.

De Lano Parker, Memphis, Tennessee, Pro Se.

## OPINION

## I. Background

In 2001, Appellee De Lano Parker was hired as a Corrections Officer with the Shelby County Sheriff's Office ("Sheriff's Office"), a division of the Appellant Shelby County Government. Other than a brief furlough in 2003, when Mr. Parker was released from his employment due to fiscal concerns and a few administrative suspensions, Mr. Parker was employed with the Sheriff's Office continually until his employment was terminated in 2009.

Some time in late 2005 or early 2006, while Mr. Parker was employed with the Sheriff's Office,[1] he took part in a video entitled *Rappers, Hustlers, and Hoes*. In the video, Mr. Parker appears under the persona of Skye Corleone ("Corleone") a rapper and gang member. In the video, Mr. Parker, as Corleone, states that he has been a rapper for fifteen years and "before that" a member of the Vice Lords gang for eighteen years.[2] It is unclear whether the video was intended as a documentary or as fictional; however, the video clearly states that it portrays the "real" Memphis underground. Additionally, in places, the video contains captions noting the onscreen personality's real name. No such caption appears during Mr. Parker's onscreen interview.

Apparently as a result of his appearance in this video, Mr. Parker complained to Sheriff's Office supervisors that fellow officers and inmates were insinuating that he was a member of a gang. At some point after Mr. Parker made these complaints, the Sheriff's Office was anonymously provided with a copy of *Rappers, Hustlers, and Hoes*. Based on Mr. Parker's statement and participation in the video, on March 2, 2009, the Sheriff's Office commenced an investigation of Mr. Parker's activities. On April 29, 2009, Mr. Parker received a letter detailing the results of the investigation and charging Mr. Parker with two violations of the Shelby County Sheriff's Office Standard Operating Procedures ("Standard Operating Procedures"), one for a lack of truthfulness, and one for personal conduct. On May 12, 2009, the Sheriff's Office held an administrative pre-disciplinary hearing on the charges. Mr. Parker was present for the hearing and was represented by counsel. On June 4, 2009, Rod W. Bowers, the Assistant Chief Jailer of the Shelby County Jail, sent Mr. Parker a letter with the findings of the hearing. In the letter, Chief Bowers stated that he found Mr. Parker guilty on both charges and terminated Mr. Parker's employment with the Sheriff's Office.

---

[1] Mr. Parker first insisted that his participation in the video took place in 2003, while he was on furlough from the Sheriff's Office. However, as discussed below, after evidence was produced that showed that references in the video were from 2005 or later, Mr. Parker admitted that the video was made while he was an employee of the Sheriff's Office.

[2] At the time of filming, Mr. Parker was approximately thirty-five years old.

Mr. Parker appealed the termination of his employment to the Shelby County Civil Service Merit Board ("the Board").[3] A hearing was held on August 13, 2009. Mr. Parker testified that he participated in the video only as a marketing ploy. Further, throughout the proceedings, Mr. Parker maintained that his portion of the video was shot in 2003. According to Mr. Parker, he had previously been involved in rap music, both as an artist and a producer. At the time the video was shot, Mr. Parker was attempting to make one last foray into the rap music world. Mr. Parker, as Corleone, appeared in the video discussing his gang membership allegedly in order to increase his exposure and to promote an image of being a "tough guy" in contrast to the reality that he worked in law enforcement. Specifically, Mr. Parker stated that "you can't maintain a[n] image of a tough guy when they know you work for the Shelby County Government. And you know . . . you can't sell records or compete with those other guys that are putting up a better persona." However, Mr. Parker emphasized that he was not a member of any gang at the time of filming or at any time in the past. Instead, Mr. Parker explained that his statements were scripted and that portions of his part in which he states that he, as Corleone, is no longer a gang member and discusses the dangers involved in gang activity, were ultimately cut from the film.

When asked whether he was regularly recognized as a corrections officer even when he is off-duty, Mr, Parker replied that he was. Specifically, he stated that he often sees former inmates when he is off-duty, who acknowledge him. Mr. Parker further admitted that he is easily recognizable because of his appearance, which was not disguised in the video. Mr. Parker stated that he believed the investigation against him began due to the fact that he had filed several Equal Employment Opportunity Commission complaints against the Sheriff's Office alleging that he had been discriminated against for being Muslim.

Chief Bowers testified next. Chief Bowers testified that, after receiving the video, the Sheriff's Office instituted an investigation into Mr. Parker's involvement and conduct. During the investigation, officers spoke with Mr. Parker on a number of occasions and Mr. Parker testified at the pre-disciplinary hearing. According to Chief Bowers, Mr. Parker's statements evolved over time. First, Mr. Parker denied ever having said in the video that he was a member of a gang; later, after being shown the video, Mr. Parker admitted having made that statement, but explained that he was merely acting in the video, which he maintained was entirely fictionalized. In deciding to sustain the charges against Mr. Parker, Chief Bowers testified that he "felt the heart of the mater was his appearance in this video in representing himself as a gang member. And that . . . created major problems for the jail with regard to trust and security." When asked why that was important, Chief Bowers

---

[3] Mr. Parker was represented by counsel throughout the Board proceedings and at the start of the proceedings in Chancery Court, until his counsel withdrew. From that time, Mr. Parker was self-represented. Mr. Parker also was also self-represented on appeal.

explained:

> Well, first off, I would point out the video itself is not something you would find at Blockbuster. . . . [I]t's an X-rated video. There's a lot of pornographic images in it.
>
> And this is something that would be sold and probably watched and viewed by a lot of the people that end up in our jail, quite frankly. And I believe that's probably how it came to our knowledge in some roundabout way.
>
> Mr. Parker looks very much as he does now, in the video. I think anybody that saw him in the jail and saw the video would say, Hey, wait a minute, that's Mr. Parker saying he is a gang member. . . . Well, that's a problem . . . because we have a lot of gang members in the jail. . . . And one of the ways we maintain order and discipline in the jail is we track all gang members. . . . And for instance, for an inmate to believe that the person is a gang member is an extremely serious matter right there that could result in violence, perhaps, on the officer or other inmates.
>
> So that right there is a problem without getting into the aspects of the coworkers. If correctional work in a jail is anything, it's teamwork. And you have to trust people you work around.
>
> If I think that you might be a gang member, that alone is a problem. And I think that Mr. Parker has complained about that being a problem before. . . . [I]n another disciplinary matter, he was complaining rumors were going around about him being a gang member. . . . [H]e felt like people were afraid of him unnecessarily.

Chief Bowers also testified that an investigation had previously been instituted to determine if Mr. Parker was in a gang, but the investigation was unable to substantiate any of the allegations. Chief Bowers did indicate that, if the video was clearly shown to be only for "entertainment" purposes, rather than a documentary,"it would very likely mean that he would not be terminated." Chief Bowers went on to state, however, that his opinion would not necessarily change if he learned that Mr. Parker was not, in fact, a gang member because "it's still a documentary and he was representing himself, you know, as a gang member. . . . The evidence is the movie. It appears to be real and a documentary." Thus, Chief Bowers testified that, after viewing the film, Mr. Parker's statements, the investigative report, and

Mr. Parker's personnel file,[4] Chief Bowers determined that Mr. Parker had violated the Standard Operating Procedures with regard to Personal Conduct and Truthfulness. Due to the seriousness of the violations, as well as Mr. Parker's past behavioral issues, Chief Bowers testified that he felt that termination was appropriate.

James E. Coleman, Chief Jailer of the Shelby County Jail testified that he concurred in Mr. Bower's decision to terminate Mr. Parker's employment. Specifically, Chief Coleman stated that the film was treated as a documentary during the investigation due to the opening scene in which the narrator describes the events as the "real underground Memphis street." Regarding his belief that Mr. Parker's statements constituted a breach of the Personal Conduct Provision of the Standard Operating Procedures, Chief Coleman testified:

> Well, the first thing . . . I doubt seriously that the inmates are going to do the math on how long an individual has been in a gang, unless they personally know the individual.
> Secondly, it puts everybody that works in the jail, everybody that's in the jail period, in danger. If we have people who on the outside that are supposed to be protecting those on the inside from gangs or at least they admitted to being involved in gangs. Our job is to police those on the inside to keep them safe from all persons, especially gang members.
> And we cannot afford to have anyone that proclaims to be a member of a gang in that capacity working in our jail. It just puts everybody in jeopardy. . . .

> \* \* \*

> Working in the jail, individuals have identified you as a gang member. They will use that for personal gain. They will use that against you. They will use that against other jailers. And there's something even more than that. This jail has spent the last six years trying to improve its image to make sure that we have credible individuals working in the jail. To have someone that's depicting themselves as a gang member takes the credibility of every officer that works in the United States as a whole and just puts a bad smear on our entire profession. It

---

[4] According to Chief Bowers and Mr. Parker's own testimony, Mr. Parker had twice been sanctioned under the Standard Operating Procedures after making threats against other employees. Mr. Parker had also been sanctioned for more minor offenses, such as missing work and tardiness.

puts everybody in danger.

Chief Coleman further testified that several complaints were made to him regarding rumors that Mr. Parker was a gang member, but that no official disciplinary action was taken until the video surfaced. However, Chief Coleman further stated that "if I'd learned he was not in a gang, it would have been important because I would no longer accuse him of being in a gang." When asked if he would have terminated Mr. Parker's employment if he knew that Mr. Parker was not, in fact, in a gang, Chief Coleman indicated that he would not have.

Sergeant Terry Strong, the chief investigating officer in this case also testified. Sergeant Strong stated that Mr. Parker described the video as a documentary, but later stated that his role in the video was scripted. From her perspective, Mr. Parker was not credible because, on the video, which she viewed as a documentary, Mr. Parker stated he had been a member of a gang; however, when questioned, Mr. Parker stated that he had never been in a gang and that he had never stated that he was in a gang. Indeed, a transcript of a February 20, 2009 interview between Sergeant Strong, another officer, and Mr. Parker was entered as an exhibit. In the transcript, the officers ask Mr. Parker:

> Officer: Have you ever made the statement that I've been a gang member. That I was a vice lord? Never made that statement?
>
> Parker: Ugh ugh.
>
> Officer: I want you to think about that now. There is no documentation, not any kind of sort or type of you saying you were a gang member?
>
> Parker: Not to my knowledge.
>
> * * *
>
> Officer: I just want to be clear that there is nothing out there in your music genre now . . . just speaking of your music thing . . . music could be your person trying to sell this they could be trying to sell themselves they could be trying to do this that and the other. But you've been around people who may have portrayed themselves as gang members and may not have been gang members am I correct? So is there anything out there that you . . . I am a gang member.

Parker: I don't think so.

Officer: You sure?

Parker: I don't think so.

Based upon the foregoing testimony, Sergeant Strong felt that Mr. Parker had committed a truthfulness violation. Sergeant Strong admitted, however, that she did not use any of the Sheriff's Office's resources to independently confirm whether Mr. Parker had ever been a member of a gang. Sergeant Strong explained that those resources were used to determine if inmates are gang members, not employees.

Finally, James Lomax, a fellow deputy jailer with the Sheriff's Office testified. Mr. Lomax testified that he was also involved in the music industry, much like Mr. Parker. In addition, Mr. Lomax appeared in *Rappers, Hustlers, and Hoes* alongside Mr. Parker to promote Mr. Lomax's career as a disc jockey. Mr. Lomax testified that the movie was produced by a former employee of the Sheriff's Office, who had produced several movies of its kind. According to Mr. Lomax, Mr. Parker's action in taking on the persona of gang-member Corleone for this video and his rap career is a common occurrence in the music industry. However, Mr. Lomax testified that Mr. Parker's statements in the movie were fictitious and that he had never known Mr. Parker to be a gang member. When asked whether the movie was intended to be a documentary, Mr. Lomax testified:

> It was supposed to be a portrayal of what [the producer] perceived Memphis to be overlooking in the entertaining industry, and trying to shed light on what he thought Memphis was.
>
> * * *
>
> He used rappers to portray that image, rappers and some DJs and those people that he thought would bring some validity to his video.

Mr. Lomax further agreed that the producer's intention in creating the video was to create a portrayal of Memphis that was "believable and valid."

Although Mr. Lomax participated in the video, he testified that no investigation had ever been instituted against him. In addition, Mr. Lomax testified that other officers had participated in the video, but none of them were under investigation. Mr. Lomax admitted,

-7-

however, that neither he, nor any of the other officers involved in the production, professed to be gang members in the video. Mr. Lomax explained that, as disc jockeys, he and the other officers are not required to have "street image[s]" as "drug dealers, gang members, [or] killers," unlike rap artists, such as Mr. Parker.

The Board entered an order sustaining the charges against Mr. Parker on September 2, 2009. The order states:

> After the testimony presented, reviewing the exhibits, the policies and procedures of the Shelby County Sheriff's Department, this board found that the Sheriff's Office met the burden of proof for "cause" in the termination of Delano Parker. [Mr. Parker's] appearance and participation in the video clearly features him stating that he "was a member of a gang." His actions undermined his ability to continue as an effective member of the Sheriff's Office because he left the impression through the video of being in a gang, which violates SOR 104, Personal Conduct. In regards to SOR 108 - Truthfulness, [Mr. Parker] impressed the Board to have difficulty staying with one version of the story.
>
> IT IS, THEREFORE, the decision of the Board that the termination is upheld.

Mr. Parker filed a petition in the Shelby County Chancery Court for judicial review of the Board's decision on October 2, 2009. During the proceedings, Mr. Parker made several arguments, including: (1) he was not an employee of the Sheriff's Office at the time the video was filmed; (2) the Sheriff's Office failed to prove that he was, in fact, ever a member of any gang; and (3) his termination for participating in a video violated his First Amendment Constitutional Rights.

Based on Mr. Parker's allegation that the video was filmed during a time when he was not an employee of the Sheriff's Office and had, in fact, been laid-off due to budgetary issues, the trial court remanded back to the Board solely to determine the date the video was shot. After hearing evidence, which showed that a banner on the Memphis Cook Convention Center visible in the video was only used from July 1, 2005 to June 30, 2006, and that Mr. Parker was an employee during that time, the Board determined that the video was shot while Mr. Parker was an employee of the Sheriff's Office. The Board entered an answer to the remand on July 18, 2011.

Mr. Parker's counsel subsequently withdrew and Mr. Parker began representing himself. Mr. Parker filed several motions to have the video and other evidence excluded. The case was then transferred from Part I of the Shelby County Chancery Court to Part II.

Mr. Parker's petition for judicial review was heard by Part II of the Shelby County Chancery Court on January 25, 2011. On February 15, 2012, the trial court entered an order reversing the Board's decision to uphold Mr. Parker's termination. The order explained:

> At the hearing before the Shelby County Civil Service Merit [] Board, the Sheriff['s Office] presented no proof to support its position that [Mr.] Parker was or had been a gang member other than the statement by his fictitious character "Corleone" in the video. Even though Chief James E. Coleman, chief of the Shelby County Jail, testified that if he had learned that [Mr.] Parker was not in a gang during his entire employment by the Sheriff['s Office] from 2001-2009, he would not have terminated him, no effort was made to verify if Parker's denial was truthful. Both Assistant Chief Rod Bowers and Sergeant Terry Strong testified that the Sheriff['s Office] had resources within the jail and the Sheriffs Department to determine gang membership. [Chief] Bowers testified that although he had "sources of information" within the jail specifically directed at determining who is a gang member, he did not use those resources to independently verify whether Parker, in fact, was or had been a gang member. [Sergeant] Strong testified that [s]he also did not do any independent investigation to verify whether or not Parker was a gang member even though the Sheriff had resources within the jail, including the Gang Intelligence Unit, to validate inmates who are gang members. On the other hand, not only did [Mr.] Parker deny ever having been in a gang but his testimony is corroborated by Deputy Jailer Lomax. [Mr.] Lomax, employed by the Sheriff since 1997, testified that he too was in the video. [Mr.] Lomax stated that he knew Parker is not in a gang and had never known him to be in a gang and that Parker assumes the persona of "Corleone" when working in the music business. [Mr.] Lomax also testified that he has never been investigated or even talked to by the Sheriff concerning his participation in the video.
>
> The Sheriff['s Office] based its decision to terminate

-9-

Parker on his alleged gang membership. The only basis for the Civil Service Merit [] Board to sustain the Sheriff['s Office's] decision would be some proof that [Mr.] Parker was or had at some time been a gang member. There is no such proof in this record. The only fact proved by the Sheriff['s Office] is that [Mr.] Parker, while acting in a video under the persona "Corleone," stated that he had been a gang member 18 years prior to being a rapper for 15 years. [Mr.] Parker denied that he had ever been a member of a gang and that his character that made the statement was fictional. This is corroborated by [Mr.] Lomax. Based on the record before this court there is not substantial and material evidence to support the decision of the Civil Service Merit Board in this case.

The trial court also noted that "art appreciation is in the eye of the beholder. While the Court does not have an appreciation for hi-hop videos, it cannot deny that someone must and that is otherwise protected free speech." However, no discussion of First Amendment law or its application to the facts of this case is included in the trial court's decision. The trial court also denied all of Mr. Parker's outstanding motions regarding the exclusion of evidence. The Sheriff's Office appeals, raising a single issue: Whether the trial court erred in finding that the Board's decision that Mr. Parker violated the Standard Operating Procedures was not supported by substantial and material evidence?

## II. Analysis

In filing his petition for judicial review, Mr. Parker sought to overturn the final decision in a contested case proceeding under the Uniform Administrative Procedures Act; accordingly, the standard of review for this case is determined by statute. Specifically, the statute provides, in pertinent part:

The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

-10-

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.
(i) No agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision.

Tenn. Code Ann. § 4-5-322(h). A reviewing court should generally defer to an administrative agency's decision when it is acting within its area of specialized knowledge, experience, and expertise. *Williamette Indus., Inc. v. Tennessee Assessment Appeals Comm'n*, 11 S.W.3d 142, 146 (Tenn. Ct. App.1999) (citing *Wayne Cnty. v. Tennessee Solid Waste Disposal Control Bd*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988)). This Court reviews the factual findings of the Commission under the limited provisions of Tennessee Code Annotated Section 4-5-322, and we review matters of law *de novo* with no presumption of correctness. *Davis*, 278 S.W.3d at 264 (citing Tenn. R. App. P. 13(d); *Cumulus Broad. Inc. v. Shim*, 226 S.W.3d 366, 373 (Tenn. 2007)). Under Tennessee Code Annotated Section 4-5-322, the courts are allowed to reverse or modify an agency's decision if the findings, inferences, conclusions or decisions are in violation of constitutional or statutory provisions, or unsupported by evidence that is both substantial and material in light of the entire record. *Metropolitan Gov 't of Nashville v. Tennessee Dept. of Educ.*, 111 S.W.2d 427 (Tenn. Ct. App. 1989). In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Tenn. Code Ann. § 4-5-322 (5)(b); *City of Memphis v. Civil Serv. Comm 'n of City of Memphis*, 216 S.W.3d at 316; *see also Gluck*, 15 S.W.3d at 490.

Shelby County specifically argues that the trial court erred in finding that the Board's decision to terminate Mr. Parker's employment was not supported by substantial and material evidence. This Court discussed the standard of review for Tennessee Code Annotated Section 4-5-322(h)(5) in detail in *Jackson Mobilphone Co., Inc. v. Tennessee Pub. Serv. Comm'n*, 876 S.W.2d 106 (Tenn. Ct. App. 1993), as follows:

The standards of review in Tenn. Code Ann. § 4-5-322(h)(4) and Tenn. Code Ann. § 4-5-322(h)(5) are narrower than the standard of review normally applicable to other civil cases. They are also related but are not synonymous. Agency decisions not supported by substantial and material evidence are arbitrary and capricious.

* * *

> [A] reviewing court should not apply Tenn. Code Ann. § 4-5-322(h)(5)'s "substantial and material evidence" test mechanically. Instead, the court should review the record carefully to determine whether the administrative agency's decision is supported by "such relevant evidence as a rational mind might accept to support a rational conclusion." The court need not reweigh the evidence, and the agency's decision need not be supported by a preponderance of the evidence. The evidence will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed.

*Jackson Mobilphone*, 876 S.W.2d at 110–11 (citations omitted).

In this case, Mr. Parker was charged with two violations of the Sheriff's Office Standard Operating Procedures. We will consider each one in turn. First, Mr. Parker was charged with a violation of Standard Operating Rule 104 - Personal Conduct, which states:

> The conduct of each employee, both on and off duty, is expected to be such that it will not reflect adversely on other employees, the [Sheriff's Office], Shelby County, or the law enforcement profession. This regulation applies to both on and off duty conduct of all employees. It prohibits any and all conduct which is contrary to the letter and spirit of the [Shelby County Sheriff's Office] policy and procedure which would reflect adversely upon the [Shelby County Sheriff's Office] or its employees. It includes not only all unlawful acts by employees but also acts which, although not unlawful in themselves, would violate [Shelby County Sheriff's Office] policy #106 Code of Ethics,[5] and/or would degrade or bring disrespect upon the employee or [Shelby County Sheriff's Office].

We have thoroughly reviewed the record in this case and conclude that the Board had substantial and material evidence to support its decision that Mr. Parker's conduct in participating in a video, which purports to be "believable and valid," and specifically his statement that he was a member of a gang for a number of years reflects adversely on the

---

[5]Shelby County Sheriff's Office policy #106 Code of Ethics is not defined in our record.

-12-

Sheriff's Office and its efforts to create an image of respectability not tainted by corruption.

From our review of the evidence, Mr. Parker's purpose in participating in the video was to promote an image of himself as a "tough guy," in contrast to the reality that he was a corrections officer. Apparently, Mr. Parker achieved this purpose; the record shows that Mr. Parker admits that others believed him to be a gang member, presumably due to his participation in the video. Indeed, it was Mr. Parker who instigated this investigation with complaints that inmates and fellow officers were afraid of him because of allegations that he is in a gang. Mr. Parker cannot now complain that this fear is unfounded because he has never been a gang member if that is precisely the reaction that Mr. Parker was trying to promote.

There is ample testimony in the record that the simple fact of professing to be a gang member, regardless of whether one actually is a member of a gang, creates problems in a jail setting and reflects poorly on the Sheriff's Office as a whole. First, Chief Bowers testified that Mr. Parker's appearance in the video stating that he was a member of a gang undermines the trust required to work in a jail setting. Further Chief Coleman testified that Mr. Parker's statement that he was a member of a gang creates a risk of violence due to some inmates believing that others are receiving preferential treatment. Further, Chief Coleman testified that Mr. Parker's action in publicly proclaiming that he had been a member of a gang in an X-rated video, where his identity can be clearly established, undermines the work of the Sheriff's Office to improve its own image and gain credibility within the community. This testimony clearly supports the Board's conclusion that Mr. Parker's action in stating that he had been a member of a gang reflected adversely on the Sheriff's Office. Indeed, the evidence in the record shows that Mr. Parker's action increased the risk of violence in the jail and besmirched the reputation of the Sheriff's Office as a whole.

The trial court, in contrast, found that the Board's decision was not based on substantial and material evidence because the Sheriff's Office failed to prove that Mr. Parker had ever been a gang member. Unlike the trial court, we do not believe this to be the dispositive issue. The issue is not whether Mr. Parker was a gang member. The issue is whether sufficient evidence was presented to conclude that Mr. Parker violated the Standard Operating Procedures of the Sheriff's Office. On appeal from an administrative decision, the court is not permitted to review the evidence, but must only determine whether there is substantial and material evidence in the record to support the Board's conclusion. *See* Tenn. Code Ann. § 4-5-322(h)(5)(B). Substantial and material evidence is "something less than a preponderance of the evidence, but more than a scintilla or glimmer." ***Wayne Cnty v. Tenn. Solid Waste Disposal Control Bd.***, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988). Accordingly, on appeal to the Chancery Court, the Sheriff's Office was not required to prove

that Mr. Parker was a gang member; instead, the Sheriff's Office merely needed to show that there was sufficient evidence in the record to support the Board's decision. The Sheriff's Office has clearly met its burden in this case. Regardless of whether Mr. Parker was ever actually in a gang, the record shows that people associated with the jail recognized Mr. Parker from the video and believed that he was, in fact, in a gang. Indeed, as we perceive it, Mr. Parker's intention was for those viewing the video to believe that he, as Corleone, had been in a gang, to further his image as a "tough guy" in order to sell his rap music. The image of a "tough guy" gang member is clearly at odds with the image the Sheriff's Office, as a law enforcement and correctional institution, seeks to promote. Thus, from our review of the evidence, the Board had ample evidence to support its conclusion that Mr. Parker's participation and statements in this video amounted to a violation of Standard Operating Rule 104 - Personal Conduct.

Mr. Parker was also charged with violating Standard Operating Rule 108 - Truthfulness, which states:

> An employee shall not give any information, either oral or written, in connection with any assignment or investigation that is either knowingly incorrect, false, or deceitful, except in the lawful performance of assigned duties such as lawful, documented, authorized under cover activity. This includes a prohibition against deliberate or intentional omissions or misrepresentations of material fact. Employees will not make false reports either verbally or in writing.

The trial court reversed the finding of the Board and concluded that substantial and material evidence did not exist to support the Board's finding with regard to this charge. Specifically, the trial court reasoned that, if the Sheriff's Office did not prove that Mr. Parker was in a gang, they did not prove that he was lying when he told investigating officers that he was not in gang. Respectfully, we again disagree.

The record clearly shows that Mr. Parker was untruthful throughout this investigation. First, Mr. Parker insisted, until the proceedings in the trial court, that the video was shot in 2003, when he was not an employee of the Sheriff's Office. Based on clear evidence in the video regarding a banner that was only in place at the Memphis Cook Convention Center in 2005 and 2006, the Board determined that Mr. Parker's part in the video was shot in 2005 or 2006, in contrast to his previous statements. In addition, when questioned about whether he had ever said that he was in a gang, Mr. Parker repeatedly answered that he had not. It was only when was faced with the video evidence that Mr. Parker admitted that he had made that statement. When faced with the video evidence, Mr. Parker insisted that he was merely

portraying a fictional character when he claimed gang membership. Accordingly, we conclude that there was likewise substantial and material evidence in the record to sustain the Board's determination on this issue.

We note that our decision holds that substantial and material evidence in the record supports the Board's decision to terminate Mr. Parker's employment based on Mr. Parker's statements that he was in a gang for a number of years. Our decision does not hold that substantial and material evidence supports a determination that Mr. Parker was, in fact, in a gang. The Board did not find that Mr. Parker was in a gang, and his membership in a gang was not the basis of its decision, despite the trial court's ruling. Accordingly, Mr. Parker's employment was terminated for statements he made while an employee of the Sheriff's Office. Thus, Mr. Parker's First Amendment Free Speech rights are implicated. *See generally* U.S. Const. amend. I. Public employees do not necessarily shed their First Amendment rights of speech and political association in exchange for their jobs, but they often must make adjustment; that is to say, public employees' exercise of certain First Amendment rights may legitimately be restrained where it could lead to inability of elected officials to get their jobs done on behalf of the public. *See **King v. Betts***, 354 S.W.3d 691, 712–13 (Tenn. 2011) (citing ***Waters v. Churchill***, 511 U.S. 661, 671 (1994)).

Although he does not raise it as an issue, Mr. Parker's brief asserts that, even if his violations of the Standard Operating Procedures are supported by substantial and material evidence, his termination is in violation of his First Amendment right to free speech. While review of administrative decisions is limited, a reviewing court may reverse an administrative decision when it is "[i]n violation of constitutional or statutory provisions." Tenn. Code Ann. §4-5-322(h)(1). Therefore, the question of whether Mr. Parker's termination violated his First Amendment rights is clearly relevant in this case, if properly before this Court. Usually an issue not raised on appeal is considered waived by this Court. *See **Childress v. Union Realty Co.***, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002). However, an appellee is only required to raise errors committed by the trial court as issues. *See* Tenn. R. App. P. 27(b) (requiring the appellee to raise issues only if he or she is "requesting relief from the judgment"). In this case, the trial court did state, in a footnote, that Mr. Parker's statements in the video were "otherwise protected free speech." Therefore, the trial court ruled in Mr. Parker's favor. The determination of whether the government, as an employer, has discretion to limit an employee's speech without violating the First Amendment involves a multi-part inquiry. *See **King***, 354 S.W.3d at 13 (citing ***Garcetti v. Ceballos***, 547 U.S. 410, 418 (2006)). However, the trial court's ruling contains no analysis on this issue, nor does it cite any law to support its decision. Trial courts charged with reviewing administrative decisions pursuant to Tennessee Code Annotated Section 4-5-322 are required to make appropriate findings of fact and conclusions of law. Tenn. Code Ann. § 4-5-322(j) ("The reviewing court shall reduce its findings of fact and conclusions of law to writing and make

them parts of the record."). Generally, if the trial court fails to make sufficient findings of fact and conclusions of law, the appropriate remedy is to "vacate the trial court's judgment and remand the cause to the trial court for written findings of fact and conclusions of law." *Lake v. Haynes*, No. W2010–00294–COA–R3–CV, 2011 WL 2361563, at \*1 (Tenn. Ct. App. June 9, 2011).

The issue of Mr. Parker's First Amendment rights was also submitted to the Board; in its order sustaining the charges against Mr. Parker, the Board clearly notes that Mr. Parker "feels his First Amendment Rights were violated." However, the Board likewise failed to analyze or make any conclusions of law on this issue. Like the trial court, the Board was required to make findings of fact and conclusions of law with regard to the issues raised before it. *See* Tenn. Code Ann. § 4-5-314(a) (requiring that the Board's final order in an administrative hearing contain "conclusions of law, the policy reasons therefor, and findings of fact for all aspects of the order"). This Court has previously held that, when the Board fails to make sufficient findings of fact and conclusions of law on an issue, the proper remedy is to remand to the Board for reconsideration. *See Swift Roofing, Inc. v. State*, No. M2010-02544-COA-R3-CV, 2011 WL 2732263 (Tenn. Ct. App. July 13, 2011). In this case, there is nothing in the record indicating that either the Board or the trial court adequately considered Mr. Parker's First Amendment argument. While we take no position as to whether the First Amendment protects Mr. Parker's employment, we conclude that this issue must be considered by the Board. Accordingly, we vacate the judgment of the trial court finding that Mr. Parker's statements are "otherwise protected free speech" and remand to the Board solely for consideration of the issue of whether Mr. Parker's First Amendment rights protect him from termination despite this Court's holding that the Board's decision to terminate Mr. Parker for violations of the Standard Operating Procedures is supported by substantial and material evidence.

## IV. Conclusion

The judgment of the Shelby County Chancery Court is reversed in part, vacated in part, and remanded to the Civil Service Merit Board for further proceedings consistent with this opinion. Costs are taxed one-half to Appellant Shelby County Government, and its surety, and one-half to Appellee Delano Parker, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

-16-