THACH v. BROWN KNITTING CO. No. 2.—132 S. W. (2d) 228.

Eastern Section. April 9, 1939.

Petition for Certiorari denied by Supreme Court, October 7, 1939.

Thompson & Ballard, of Chattanooga, for appellant.
C. A. Noone, of Chattanooga, for appellee.

AILOR, J. The original bill in this cause was filed by Tom S. Thach, trustee in bankruptcy for Rizac Manufacturing Company, seeking to set aside certain alleged preferences and fraudulent conveyences on the part of said Rizac Manufacturing Company prior to the time of its adjudication as a bankrupt on voluntary petition. Upon a hearing before the Chancellor a decree was entered in which all issues were found in favor of defendant and the original bill was dismissed. Complainant has appealed from this decree and has assigned errors in this court. Four separate but related issues are raised by assignment of errors. These issues involve the proper application of provisions of the Uniform Law Relating to Fraudulent Conveyances enacted by the General Assembly of Tennessee of 1919, and brought forward in the Official Code of 1932 in Sections 7271 to 7278, inclusive. None of the acts complained of transpired within four months of the adjudication in bankruptcy, and it is not insisted that they

were void by reason of the provisions of the National Bankruptcy Laws otherwise than as same provide that a trustee in bankruptcy may avoid any transfer which the bankrupt's creditors might have avoided as provided by the Bankruptcy Act Section 70, sub. e, 11 U. S. C. A. Section 110, sub. e.

The particular provisions of the Act under which it is sought to set aside the transactions attacked is embraced in Section 7274 of the Tennessee Code, and is in language following:

"Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration."

Fair consideration is described by the Act, as codified in Section 7273 of the Official Code, as follows:

"Fair consideration is given for property, or obligation, (a) when in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or (b) when such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained."

The first error assigned involves both real and personal property taken over by defendant upon foreclosure of two trust deeds securing notes for $10,000 and $40,000, respectively. The proceedings terminating in the foreclosures complained of in this connection were conducted in the Chancery Court of Hamilton County, Tennessee, and no attack is made upon the regularity of said proceedings. It is insisted on behalf of complainant that these proceedings were a nullity so far as his rights are concerned, and that he is not bound thereby, for the reason that he was not a party to same. On the other hand it is insisted on behalf of defendant that these proceedings are conclusive in this case and not subject to collateral attack as is being attempted herein. We are of opinion that the foreclosure proceedings were not necessarily conclusive of the rights of complainant, and that he could attack same in a proper proceeding to set same aside. However, we think it not necessary to pass upon this question at this time.

There is not much dispute as to the facts in this connection. The Lookout Knitting Mills owned certain property located in Hamilton County Tennessee. It borrowed money and gave a trust deed on the property in question to secure the money borrowed to the amount of $10,000. Thereafter Volunteer Knitting Mills became the purchaser of said property subject to the lien of said trust deed. Volunteer Knitting Mills and Rizac Manufacturing Company are one and the same so far as this suit is concerned, the name Volunteer Knitting Mills having been changed to Rizac Manufacturing Company. Sometime after Volunteer Knitting Mills had purchased the property

secured by said trust deed the bank holding the note demanded settlement of same. We think it fair to assume from the record that Volunteer Knitting Mills was not in position to discharge this indebtedness at the time demand for payment was made. At any rate the defendant in this cause paid the obligation to the bank and took an assignment of the note and trust deed. This transcation is not questioned, and we think that no question could be raised in this connection.

However, at a later date when the depression in business became more acute, Rizac Manufacturing Company, new name for Volunteer Knitting Mills, found itself unable to raise sufficient cash to pay certain advancements which had been made to it. This demand was met by a loan of $40,000 by the defendant herein. As security for this loan, Rizac Manufacturing Company, which will be hereinafter referred to as the bankrupt corporation, executed a trust deed on all or practically all of its real and personal property at Chattanooga. This trust deed was secondary to that for $10,000 already mentioned. Thereafter the bankrupt corporation continued to operate as a going concern and in its usual course of business for a period of about nine months, and did business of around $380,000. However, at the end of the nine months from the time the loan was made the corporation was again in need of operating capital with which to continue its business, and being unable to obtain the amount necessary, it suspended operations. Thereupon the two trust deeds were foreclosed in Chancery Court and the property was sold. This entire proceeding is attacked.

The substance of complainant's insistence is that the Volunteer Knitting Mills, later Rizac Manufacturing Company, and defendant, Brown Knitting Company, are or were affiliate corporations with interlocking directorates, and such identity of ownership and management as to render it impossible to distinguish them as separate identities and that by reason of this fact transactions between the two corporations were void as to third parties, especially so far as the rights of the trustee in bankruptcy is concerned. But we find ourselves unable to agree with this insistence. It is true that there was a very close relationship between defendant corporation and the bankrupt corporation. They were originally owned by the same parties for all practical purposes, but they were run as separate enterprises, and we find no indication that there was any diversion of assets without full restitution of the value thereof.

Originally four Campe brothers were extensively engaged in manufacturing and selling knit goods. For the purpose of carrying on their various enterprises they organized corporations under the jurisdictions of the various localities of their enterprises. Corporations were organized in several of the northern and eastern states for the manufacture of knit goods, and a corporation was organized for the

purpose of selling the product of these various mills and also to carry on a general brokerage business in similar line of merchandise. Sometime prior to 1928 a corporation was organized in Tennessee for the purpose of operating a factory or mill at Chattanooga, Tennessee, and one at Athens, Alabama. These two last named enterprises did not develop into profitable enterprises. It is possible that they did not become firmly established prior to the depression, but at any rate, they became largely indebted to other of the affiliated corporations for capital with which to operate. They also borrowed considerable machinery from other affiliated mills.

As hereinbefore set out The First National Bank of Chattanooga held a trust deed on real and personal property purchased by the bankrupt corporation in Chattanooga. When the bank insisted on settlement of this indebtedness in February, 1933, the bankrupt corporation was unable to pay same. In order to prevent a foreclosure defendant corporation took up the indebtedness and had same transferred to it. It remained a valid claim against the bankrupt corporation, both in law and in equity. At the same time the bankrupt corporation had become heavily indebted to Cambo Corporation, a holding company largely owned by the four Campe brothers, but under separate management from the bankrupt corporation. When the depression became severe in 1933 Cambo Corporation demanded payment of a portion of the indebtedness owing by the now bankrupt corporation. It was unable to raise sufficient cash to meet the demand at the time, but an arrangement was worked out whereby the defendant corporation agreed to advance the sum of $40,000 to the credit of the bankrupt corporation. This sum was advanced in payment of a valid claim against the corporation, and a trust deed was executed to secure same, conveying practically the identical property as that covered by the trust deed for $10,000. And as above set out this move permitted the Chattanooga mill to continue operations for something like nine months. We think it might be easily inferred that the Chattanooga enterprise would have continued to operate but for the failure of the Athens, Alabama, plant to succeed.

■■ As we understand it, it is not seriously insisted that these two items did not represent an actual cash outlay by this defendant to the full extent of the two trust deeds. The insistence most strongly urged in brief is that Volunteer Knitting Mills was insolvent at the time of the transactions complained of and that its assets constituted a trust fund for the benefit of all creditors alike; that the transactions operated to favor a single creditor, and consequently were void as to other creditors. It is readily apparent that this insistence cannot stand so far as the $10,000 is concerned. This constituted a valid lien upon the property at the time it was taken over by the corporation, and payment of same by defendant represented fair consideration as defined by Section 7273 of the Tennessee Code.

And while it is true that the bankrupt did not receive the $40,000 for its own use, still it received full value for same by way of payment of its obligation without which it might have been closed at the time. We think the record fails to justify the insistence that the corporation was insolvent at the time of execution of the trust deed for $40,-000 so as to render its assets trust funds for the satisfaction of the claims of creditors. We think the fact that it continued in business for nine months thereafter and did business aggregating $380,000 of itself is sufficient to refute this contention. There is nothing in the record to indicate that any actual fraud was intended.

It was natural for the parties, engaged as they were in various enterprises under the management of different parties, to provide for some limitations upon their liability in connection with the separate organizations. They organized separate corporations under different jurisdictions for that purpose. We think it would not have been possible for them to carry on the several enterprises which the record discloses without some arrangement for limitation of liability. If it should be made to appear that these separate corporations were designed or used as a means of defrauding creditors, then their acts should be carefully scrutinized by courts of justice, but such a situation is not apparent from the record in this cause. It is true that the several affiliated corporations had much business in common, and that they engaged in helpful cooperation with each other. However, we think their dealings were largely actuated by the desire to cooperate rather than any intention to hinder defraud or delay creditors. We find that Volunteer Knitting Mills gave the trust deed for the sum of $40,000 to secure a present advance of that amount by the defendant; that defendant parted with its money and took said trust deed in good faith, and that the amount was not disproportionately small as compared with the value of the property given as security. Under all the circumstances made to appear we think the rule sought to be invoked, viz., the rule that property of an insolvent corporation constitutes a trust fund for the benefit of all creditors alike has no application in this case so far as this particular property is concerned. We think the execution of the trust deed was valid and binding, and that same was not made in violation of the provisions of the Uniform Fraudulent Conveyance Laws of Tennessee. There is no basis for the assumption on the part of complainant that any intention to defraud actuated the giving of the trust deed for $40,000. If the parties in interest had planned deception and fraud, it would have been an easy matter for them to have procured the foreclosure of the $10,000 trust deed without the delay incident to the execution and foreclosure of the latter trust deed, and it is reasonable to presume that this could have been done without outside interference. This could have been accomplished long before maturity of the $40,000 claim, and without the expense incident to foreclosure of the larger amount. This conclu-

sion is supported by the fact that no claim incurred in the usual course of business was left unpaid, when the Chattanooga enterprise was wound up.

This suit is primarily a contest in the interest of Alabama Power Company to collect a claim based on a minimum charge account. Most of the claim in question accumulated after the plant at Athens, Alabama, was closed, and was based on an alleged agreement with the agent of the bankrupt corporation at that place to pay a minimum charge for electrical current regardless of the amount used. For some reason not fully explained in this record it is insisted that this contract was not terminated with the closing of the Athens plant, but that liability continued over a long period of time for a minimum monthly charge, without any regard to the amount of current actually used. Only a very small amount of the bill for electricity now sought to be recovered was in existence at the time the trust deed in question was given, and no circumstance appearing in the record remotely suggests that the transactions complained of were in any way motivated by the existence of this claim.

██ The ground for attack upon the transactions seems to be the mere fact that the ownership of the two corporations was practically identical and the directorate interlocking. And while this is a circumstance which might be looked to, still it is not sufficient to impeach an otherwise valid transaction. The two corporations were separate and distinct identities, organized and existing under separate jurisdictions. They had their own capital investments which constituted primary assets for satisfaction of claims against them. And only an unlawful appropriation of such assets could render defendant liable in this instance. The burden of establishing such unlawful appropriation by fraudulent means or insufficient consideration rested upon complainant. He has failed to carry this burden of proof. Bank v. McAdams, 106 Tenn., 404, 61 S. W., 773; Hicks v. Whiting, 149 Tenn., 411, 443, 258 S. W., 784.

██ Enforcement of the rule insisted upon by complainant in this connection would render it difficult for a corporation to borrow funds with which to carry on its operations. The mere fact of similarity of ownership of the two corporations is not of itself a badge of fraud, and neither is the fact that a debtor transfers property to pay debts. One who alleges fraud must prove same. 12 R. C. L., 485.

It is insisted in this connection that Volunteer Knitting Mills had been advised of the claim of Alabama Power Company for the sum of $5,925 prior to the time the last trust deed was given. This fact might have some bearing but for the fact that Volunteer continued to operate for nine months thereafter, during which time it did a large volume of business. It does not appear that Alabama Power Company took any steps to collect its account during this interval. We are satisfied that it would have had no trouble collecting its claim, if it

had proceeded within a reasonable time after the execution of the last trust deed. It is apparent that the Volunteer would have required large stocks of raw material to do the amount of business it did during the nine months after the execution of the trust deed. This would have been subject to satisfaction of the claim of Alabama Power Company, and, consequently, there is no showing that the execution of the trust deed complained of operated to its injury. Assignment of error in this connection will be denied.

The second question raised by assignment of error is the action of the Chancellor in denying recovery of unfinished merchandise of the value of $8,652.03, and 51 latch needle machines of the value of $24,-225. These two items do not sustain identical positions so far as the facts are concerned, but since they are treated together under one assignment we treat them the same way. The Chancellor found that there was not sufficient proof to establish lack of fair consideration in connection with the unfinished merchandise item, and denied the claim. We think this item raises the most serious question in the suit, but after careful consideration of all the facts we are unable to say that the Chancellor erred in this connection. The unfinished merchandise item represented odds and ends of questionable value, the real market value not appearing from the record. However, defendant took the material over and entered a charge on its books against itself for the amount it considered fair. And we think it fair to presume that the charge was made in connection with the taking over of other property of Volunteer Knitting Mills by defendant under a lease of its property by which defendant was to pay the sum of $650 per month for same. In other words, defendant entered into an agreement to lease the property of Volunteer Knitting Mills for the sum of $650 per month, and as a part of this lease took over the odds and ends on hand. This lease was entered into on March 4, 1933. The agreed rental appears to be reasonable, and it provided a possible source for payment of the claim of Alabama Power Company, had it been pursued with any diligence. It presents a circumstance in support of the insistence of defendant that no fraud was contemplated or practiced by it in any of the dealings complained of. Defendant paid to Cambo Corporation the full amount of the unfinished merchandise, and it appears that Cambo Corporation was a bona fide creditor of Volunteer Knitting Mills. It appears that Cambo Corporation furnished large sums of money for operating the Volunteer Knitting Mills in an effort to keep it as a going concern. The Cambo Corporation is shown to have lost a half million dollars during the depression, largely by reason of advancements to affiliate corporations. And it may be said to the credit of the Cambo management that there is no showing that any regular trade accounts incurred in connection with any of these operations remained unpaid. We are of opinion that the claim of Alabama Power Company could have been collected, and

would have been paid, if it had been pursued diligently. As above set out Cambo corporation regularly advanced large sums of money to Volunteer Knitting Mills, and that it received payments on such advances by way of manufactured products. The item of unfinished merchandise is very indefinite, it not appearing just how far the process of manufacturing had proceeded. At any rate Cambo corporation would have received the finished product in the regular course of business in repayment of advances already made. It did receive the only value of the materials appearing in the record. And the item was so trivial in comparison with the large amount of business carried on by Volunteer, and the amount of money advanced by Cambo corporation that we think it unlikely any fraud was intended. Defendant received no benefit from the transaction, and we think no violation of the statute resulted. The transaction was in fact in accord with established practice between the parties.

█ The Chancellor found that the fifty-one latch needle machines were covered by the mortgage to the Lookout Knitting Mills, and since this mortgage was regularly foreclosed, there was no basis for a recovery in this connection. We think there is no escape from this conclusion. They were also covered by the trust deed for $40,000 given by Volunteer Knitting Mills, and the sale of all the property covered by these two trust deeds failed to satisfy the amounts secured. We have held these foreclosures good, so there remained nothing in this connection for creditors.

█ In this connection it is earnestly insisted on behalf of appellant that the trust fund doctrine in connection with the assets of an insolvent corporation is applicable. Numerous authorities are cited in support of the rule and its application. The rule is clearly stated by our Supreme Court as follows: "It is true that the rule is well established in this state that the assets of an insolvent corporation become, from the date of its assured insolvency, a fixed trust fund for equal pro rata distribution among its creditors." Nickey Bros. v. Lonsdale Mfg. Co., 149 Tenn., 391, 404, 258 S. W., 776, 780.

█ However, the court held in that case that the giving of a trust deed was not such act as to indicate insolvency, and that a prior indebtedness constituted sufficient consideration for same. But this rule can have no application to the machines in question, for the reason that they were covered by the two trust deeds, which were foreclosed without realizing sufficient amount to satisfy the valid liens of such trust deeds.

The question raised by the third error assigned involves ownership of eighty-one Cooper Spring Needle machines. It is insisted on behalf of the trustee that the Chancellor erred in holding that these machines never belonged to the bankrupt corporation. It is not insisted that these machines were bought and paid for by the corporation, but

that it acquired title to same by possession of sufficient duration to raise a legal presumption of ownership.

These machines were purchased by E. Lee Campe, one of the four brothers, in February, 1927, and were first shipped from Amsterdam, N. Y., to the Volunteer Knitting Mills at Chattanooga, and they were then shipped on to the plant at Athens. There is no insistence that they were paid for by funds of Volunteer Knitting Mills. They remained at the Athens plant until 1931, when a majority of them were returned to Chattanooga. In 1933 the remainder of the machines were shipped to Chattanooga and placed in storage. When the plant at Chattanooga closed all of the machines were shipped back to Warsaw, N. Y. The proof is that these machines were merely loaned to Volunteer, and that they never belonged to it.

It is insisted in this connection that at least a part of these machines were installed at the Athens plant at the time it was purchased by Volunteer Knitting Mills, that it purchased the real estate of said plant, "together with the plant, machinery and equipment in its plant at Athens, Alabama." And that this description covered all machinery in the plant, including a portion of the machines in question. This insistence is in no way supported by the proof in the record. It is clear that these machines were not installed in the Athens plant until same had been purchased by Volunteer. It is true that formal papers evidencing transfer of the plant were not passed until after the machines had been shipped to Athens, but the purchase of the plant was already complete, and that purchase in no way affected these machines. The authorized representative of Volunteer was charged with notice that these machines were being held under a loan arrangement and not under any claim of ownership. The loan was terminated by voluntary arrangements before any right of creditors could attach, and no rights did attach.

It is further insisted that there was a conclusive presumption of ownership by Volunteer by reason of continuous possession for a period of five years under the provisions of Section 7834 of the Code of Tennessee. Provisions of the Act relied upon are as follows:

"Possession of goods and chattels continued for five years, without demand made and pursued by due process of law, shall as to the creditors of the possessor or purchasers from him, be deemed conclusive evidence that the absolute property is in such possessor, unless the contrary appear by bill of sale, deed, will, or other instrument in writing, proved or acknowledged and registered."

We are of opinion that the provisions of the law relied upon have no application to the questions presented in this suit. The Act was obviously passed for the protection of parties who had innocently purchased property and parties who had advanced credit upon the showing of apparent ownership in a party in possession. A reading of the provisions of the Act indicates that it was not designed

to regulate title as between the true owner and a person to whom property might have been loaned or otherwise held in bailment. And there is another reason why the provisions of the law would not be applicable in this case. The possession of Volunteer had terminated before any rights of third parties intervened, and the statute can have no application without the intervention of rights of third parties, when the party in possession continues to recognize the title of the true owner. If possession of Volunteer had continued until the filing of petition in bankruptcy, the creditors' rights would have become fixed and the presumption created by statute would have prevailed, provided it be shown that such possession had been continuous for a period of five years preceding the date of such bankruptcy. But possession having terminated before bankruptcy and before the rights of creditors attached by surrender of the machines to the true owner, no presumption arises. As against the true owner a person claiming the benefit of the presumption created by the provisions of the statute the party so claiming is onerated with the burden of proving strict compliance with its provisions. The proof shows that the machines in question were not purchased by Volunteer, they were not paid for by it, and it never at any time set up any claim thereto, but at all times recognized the ownership of the bailor. The Chancellor correctly held that the creditors of Volunteer acquired no rights in these machines.

 There is a further insistence that defendant made certain admissions in its answer by which it is estopped to deny that these machines were the property of the Volunteer Knitting Mills. An examination of the answer fails to disclose that there was any specific admission that these machines were the property of Volunteer. A court of Equity will not indulge in a presumption as a basis for divesting title out of one shown to be the true owner thereof and vesting title to same in another to whom a loan has been made as in the case at bar. The answer does admit that certain equipment was shipped from Athens, Alabama, to Chattanooga, and that same had been sold to Volunteer. There is no contention that these particular machines were ever sold to Volunteer, and we are of opinion that the alleged admission is too indefinite to constitute the basis for a decree, and that this insistence was properly rejected by the Chancellor.

██ The fourth and last question raised is the title to twelve flatlock machines. The evidence concerning title to these machines is very indefinite and uncertain. However, we think the proper conclusion is that they were on hand at the time the trust deed for $40,-000 was given and that they were covered by this trust deed, and that title to same passed upon foreclosure of said trust deed. As above set out there was a large deficiency ramaining upon foreclosure of this trust deed. The Chancellor found that three of these particular machines never belonged to Volunteer, and there is ample

evidence to support this finding. However, we think the evidence conclusive that these machines passed upon foreclosure of the trust deed, if they were ever the property of Volunteer, and that they were not available as an asset of the bankrupt at the time of bankruptcy.

For the reasons stated the decree of the lower court will be affirmed. Portrum and McAmis, JJ., concur.