FILED
09/29/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE[1]
March 11, 2022 Session

## MARK STEVEN MEADOWS ET AL. v. SHARON KAY STORY ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 14-1481-II      Anne C. Martin, Chancellor**

_____

**No. M2020-00886-COA-R3-CV**
_____

The members of a limited liability company, a father and his son, sought the LLC's judicial dissolution. Disagreements had surfaced between them, primarily over the ownership of assets and the value of their capital accounts. Father and son were also pitted against each other in a separate lawsuit involving other business entities. In the proceeding to dissolve the LLC, the trial court appointed a receiver to determine ownership of the assets. The court approved the receiver's report. And, after a bench trial, the court found that father's capital account was less than his son's account. In doing so, the court excluded evidence offered by father related to the separate lawsuit based on relevancy. The court also excluded the testimony of an attorney based on the attorney-client privilege. Finding no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and JILL BARTEE AYERS, SP.J., joined.

Thomas V. White, Robert L. Delaney, Lesa H. Skoney, and Timothy N. O'Connor, Brandt M. McMillan, Nashville, Tennessee, for the appellants, Sharon Kay Story, Alan Oakley, Mary Helen Meadows, and The Meadows Community Property Trust.

Christopher E. Thorsen and Austin Keith Purvis, Nashville, Tennessee, and C. Patrick Flynn and Paul J. Krog, Brentwood, Tennessee, for the appellees, Mark Steven Meadows and Nashville Ready Mix, Inc.

_____

[1] Oral Argument was heard at the Belmont University College of Law.

# OPINION

## I.

### A.

In the 1960's, Don Meadows started Meadows Landscaping Company as a sole proprietorship. His son, Steve Meadows, who was in high school at the time, worked for the business after school, on the weekends, and during summers. After graduating high school, Steve[2] started working for the business full-time.

Initially, the business focused on traditional landscaping work, such as yard grading, seeding, and planting. But after graduating high school, Steve started developing excavation work for the business.

In 1986, the business, then known as Meadows Excavating and Landscaping Company, became a partnership with Don and Steve as equal partners. A year later, Steve formed what would become Nashville Ready Mix, Inc., a concrete business. Yet the ventures were connected. Both Meadows Excavating and Nashville Ready Mix would operate from property on Baptist World Center Drive in Nashville. Don and Steve owned the property, but Meadows Excavating serviced the debt. And Meadows Excavating hauled sand and gravel for Nashville Ready Mix to make concrete.

Nashville Ready Mix eventually became Steve's focus. Meanwhile Don began paying more attention to a farm operation and general store he started in Dickson County. Meadows Excavating started to struggle financially. By 2001, its business had declined significantly. Meadows Excavating was primarily just hauling materials for Nashville Ready Mix.

In 2002, father and son began discussing the future of Meadows Excavating, which led to several changes. Although the legal effect of these changes is disputed, everyone agrees that Nashville Ready Mix took on Meadows Excavating's expenses, including hiring most of its employees and paying the debt associated with its equipment. Truck drivers who had worked for Meadows Excavating began working as drivers for Nashville Ready Mix. Nashville Ready Mix used its own trucks, as well as trucks owned by Meadows Excavating. But the Meadows Excavating trucks remained on its books. For its part, Meadows Excavating stopped billing Nashville Ready Mix for hauling services. Meadows Excavating also ended its workers' compensation and liability insurance coverage.

---

[2] Because of the shared last name and to avoid confusion, we refer to the parties by their personal names. No disrespect is intended.

After 2002, Meadows Excavating had a single employee. It continued to file federal tax returns. And despite Nashville Ready Mix's use of its trucks, Meadows Excavating continued to show the trucks as assets on its books and records. In 2009, Meadows Excavating converted to a member-managed limited liability company. *See* Tenn. Code Ann. § 48-249-703(a) (2019) (permitting any entity to convert to an LLC). Father and son each had a fifty-percent membership interest and equal governance rights. The operating agreement reflected that they had made equal capital contributions. *See id.* § 48-249-301(d) (providing that "the value and adequacy of the consideration to an LLC for each contribution[] shall be determined by the members, in the case of a member-managed LLC").

A few years later, father and son had a complete falling out. Among other points of contention, Steve was upset about withdrawals Don made from Meadows Excavating. Don ultimately executed a new will disinheriting his son and creating the Meadows Community Property Trust. Don bequeathed all his property to the trust.

B.

Shortly after Don disinherited him, Steve sued for judicial dissolution of Meadows Excavating. He claimed that he was unable "to carry on any business or associate in any manner with" Don. So it was not reasonably practicable for Meadows Excavating to continue its business. *See id.* § 48-249-617(a) (providing that a court "may decree dissolution" of an LLC "whenever it is not reasonably practicable to carry on [its] business"). Steve sought the appointment of a receiver to wind up Meadows Excavating and liquidate its assets. *See id.* § 48-249-619(a) (providing that a court "may appoint one (1) or more receivers to wind up and liquidate" an LLC).

Don responded with a counterclaim, seeking to dissolve Meadows Excavating as well. He agreed that they could no longer get along "in the conduct and management of the business." In a separate lawsuit, Don also sought to dissolve Nashville Ready Mix and receive a share of the sale of its assets. *See Story v. Meadows*, No. M2019-01011-COA-R3-CV, 2020 WL 7779038, at *1 (Tenn. Ct. App. Dec. 22, 2020), *perm. app. denied* (June 14, 2021). In the separate suit, Don claimed an implied partnership with his son that included ownership of Nashville Ready Mix. *Id.* at *5.

As the cases progressed, Don died, which triggered dissolution under Meadows Excavating's operating agreement. The representatives of his estate and the trustees of the Meadows Community Property Trust ("Defendants") replaced him as parties.

Although the parties agreed on the dissolution of Meadows Excavating, they differed sharply on other issues. The first disagreements arose during discovery. And, at trial, the parties disputed how to wind up the company and liquidate its assets. Those

3

disputes involved the ownership of personal property and Don's and Steve's capital accounts.

The discovery disputes centered on the deposition testimony of attorney Gino Marchetti. From 1987 to 2004, Mr. Marchetti represented both Meadows Excavating and Nashville Ready Mix in all aspects of their businesses. He also represented both Don and Steve on personal matters. During the deposition, Defendants questioned Mr. Marchetti about issues involving Steve, Don, and the two entities. Steve lodged thirty-four objections to those questions. He claimed that the questions called for information protected by the attorney-client privilege or the duty of confidentiality. The trial court sustained about twenty of Steve's objections. And, at trial, the court excluded portions of Mr. Marchetti's deposition from evidence.

As to the ownership of personal property, the parties fought over 777 items. The items included, among other things, antique automobiles that Don and Steve collected over the years; automotive paraphernalia and memorabilia; and pieces of heavy farm equipment. These items were located on Claylick Farm, where Don ran his farming operation.

The trial court appointed a receiver to determine ownership of the items. During the hearings, the parties reached an agreement on 193 items. But determining the ownership of the remaining items proved a difficult task. When either Don or Steve added cars or other items to their collection, the items were not assigned acquisition numbers. There were also few records establishing ownership. And some purchases were made with Meadows Excavating checks, while others were made with Nashville Ready Mix checks or cash. So items could belong to Meadows Excavating, Nashville Ready Mix, or either Don or Steve individually.

Defendants argued that the disputed items belonged to them because the items were owned by Don individually. They claimed that the ostensible ownership act conclusively established his ownership because the items were located on his farm for over five years. *See* Tenn. Code Ann. § 66-3-103 (2015). They also contended that, under a seven-factor test for determining vehicle ownership, the factors weighed in their favor.

In its report, the receiver reasoned that neither the ostensible ownership act nor the seven-factor test applied. The act was not enacted to confer rights to the possessor of property. It was enacted only to confer rights to a possessor's creditors. And the seven-factor test "d[id] not fit [this case's] fact situation well."

The receiver instead relied on all evidence presented at the hearings to determine ownership. The evidence included testimony from David Hinton, an accountant for Meadows Excavating; members of the Meadows family; and a contractor who restored many of the antique automobiles over the years. It also included checks documenting the

4

make and model of a car, entry forms for car competitions, and trophies and plaques earned at the competitions.

Based on the evidence, the receiver outlined an approach to determining ownership. There were records, such as cancelled checks, for some of the items. If those records showed that Meadows Excavating paid for an item, the receiver recommended it be an asset of Meadows Excavating. If there was no documentation for an item, the receiver recommended that it also be an asset of Meadows Excavating. He reasoned that it "seem[ed] the most equitable outcome." Don and Steve each owned half of the company. So they could equally divide the proceeds once the assets were sold.

Defendants filed an objection to the receiver's report, challenging the classification of 339 of the assets. They argued that the receiver should have applied the ostensible ownership act or the seven-factor test. The receiver had "arbitrarily" categorized assets with no documentation as assets of Meadows Excavating. Steve sought adoption of the receiver's report.

The trial court adopted the report. In doing so, the court agreed with the receiver's reasoning that the ostensible ownership act and seven-factor test did not apply. Instead, like the receiver, the court concluded that "a proper analysis required an examination of all relevant documentation and information." And the receiver "performed admirably" in conducting this analysis "using what little information [it] had." The receiver used "commendable objectivity and attention to detail."

The issue of Don's and Steve's capital accounts went to a bench trial. Meadows Excavating's accountant, Mr. Hinton, testified for Steve. He prepared tax returns for Meadows Excavating from 1986 to 2013. Doing so involved keeping track of the capital accounts. According to Mr. Hinton and the tax returns, Don's initial capital-account balance in 1986 was $190,981. And, as of 2013, it was $924,638 less than Steve's because of Don's withdrawals from Meadows Excavating over the years.

Rick Swafford, also a certified public accountant, testified for Defendants. He opined that Mr. Hinton "understated" Don's initial capital-account balance by $327,000. And, in his view, Don's account should have received various credits over the years. It should have been credited for Nashville Ready Mix's use of Meadows Excavating's trucks, which Nashville Ready Mix used without paying haul bills. And Meadows Excavating still took depreciation on them, which negatively affected Don's capital account. The account also should have been credited because Don paid for Steve's living expenses for a number of years.

The trial court found that the tax returns were the "best evidence" of Don's and Steve's capital accounts. Don signed off on all of them over the years and "never raised a

question or concern about what they reflected." And Defendants "failed to present any . . . basis" to question them.

The court also found no reason "to recognize any credits" owed to Don's account. There was an agreement for Nashville Ready Mix to use Meadows Excavating's trucks without paying haul bills. In exchange, Nashville Ready Mix paid off loans and other expenses for the trucks. Nashville Ready Mix also absorbed Meadows Excavating's payroll obligations by hiring most of its employees. This arrangement lasted for twelve years, and it kept Meadows Excavating in business. Regardless, there was no proof of how the arrangement affected the capital accounts.

Based on the tax returns, the trial court agreed with Steve that Don's capital account ultimately had a deficit of $924,638. So Steve was entitled to the first $924,638 in proceeds from the liquidation of the company's assets. These assets included antique automobiles and other property that the receiver determined belonged to Meadows Excavating.

## II.

A limited liability company dissolves, among other ways, upon "[t]he occurrence of an event specified in the LLC documents." Tenn. Code Ann. §§ 48-249-601(a)(2), 603(a)(1). Upon dissolution, an LLC is to "be wound up, and its existence . . . terminated." *Id.* § 48-249-601(c); *see Moran v. Willensky*, 339 S.W.3d 651, 660 (Tenn. Ct. App. 2010) (explaining that "'dissolution trigger[s] the next phase, the winding up of the business'" (quoting *Norris v. Stuart*, No. M2004-01839-COA-R3-CV, 2006 WL 721299, at * 4 (Tenn. Ct. App. March 20, 2006)). Winding up involves "liquidat[ing] the assets." *See Hodge v. DMNS Co.*, 652 S.W.2d 762, 764 (Tenn. Ct. App. 1982); *see also* Tenn. Code Ann. § 48-249-620(a)(1). When liquidating assets, the assets are distributed first to creditors. Tenn. Code Ann. § 48-249-620(a)(1)(A). If any assets remain, they are next distributed "to members . . . in satisfaction of liabilities for distributions." *Id.* § 48-249-620(a)(1)(B). And they are lastly distributed to members—"first, for the return of their contributions that have not previously been returned, and second, respecting the[ir] membership interests." *Id.* § 48-249-620(a)(1)(C).

Here, Meadows Excavating's operating agreement required dissolution upon the death of a member. So dissolution occurred when Don died. In winding up the company, the parties disputed whether hundreds of assets belonged to it. The receiver and trial court determined which ones did. In liquidating those assets, there were no creditors. But the court found that Don's capital account had a $924,638 deficit because of his distributions to himself over the years. So the company was first liable to Steve in that amount for those distributions.

On appeal, Defendants argue that decisions in the separate lawsuit involving Nashville Ready Mix have an impact here. They also claim that the trial court incorrectly

6

applied the attorney-client privilege during discovery and at trial. They further contend that the court erred in approving the receiver's report on the ownership of assets. And they allege that the court improperly calculated the capital accounts.

A.

Defendants contend that two decisions in the separate lawsuit involving Nashville Ready Mix adversely impacted the trial court's ruling here. In the other suit, Steve moved for partial summary judgment on Don's claim of an implied partnership. *Story*, 2020 WL 7779038, at *5. Don alleged an implied partnership between himself and his son that encompassed both Meadows Excavating and Nashville Ready Mix and several other entities. On that basis, Don asserted entitlement to an ownership interest in Nashville Ready Mix. The court dismissed the implied partnership claim on summary judgment. *Id.* at * 8. But we reversed, concluding that there was a genuine factual dispute as to whether an implied partnership existed between Don and Steve. *Id.* at *16.

Defendants argue that our reversal there compels reversal here. The essence of their argument is simply that a possible implied partnership had an "impact . . . in the wind up of Meadows Excavating's business affairs." In their view, the receiver and trial court would have come to "starkly different conclusions" if they considered an implied partnership. But Defendants do not explain how. And a party's failure "to construct an argument regarding his position on appeal constitutes waiver of that issue." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006).

Defendants do claim that Nashville Ready Mix's use of the Baptist World Center property and Meadows Excavating's trucks showed an implied partnership. And they believe the trial court did not consider evidence of how those uses affected the capital accounts. But the court did consider that evidence and rejected any impact on the accounts.

Defendants also contend that the court in the separate lawsuit improperly dismissed Don's estate as a party for lack of standing. They raise the issue because the dismissal of the estate in the separate lawsuit "also resulted in the dismissal of the Estate [here]." Defendants explain that, nothing in the order of dismissal limited the dismissal of the estate to the separate lawsuit. And, to the extent that the estate lacked standing in the separate lawsuit, the estate would lack standing here as well.

We conclude that the dismissal of the estate in the separate lawsuit is not properly before us. After Don's death, the estate was a party throughout this proceeding.

B.

The trial court limited discovery and excluded evidence at trial based on the attorney-client privilege. The privilege protects certain communications between an

7

attorney and client from disclosure. *Culbertson v. Culbertson*, 393 S.W.3d 678, 684 (Tenn. Ct. App. 2012). It "may limit discovery where applicable." *Pagliara v. Pagliara*, 614 S.W.3d 85, 88 (Tenn. Ct. App. 2020). And it may also result in the exclusion of evidence. *See Reed v. Baxter*, 134 F.3d 351, 356 (6th Cir. 1998). To invoke these protections, the client must show that "the communications were made pursuant to the attorney-client relationship and with the intention that the communications remain confidential." *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Tr.*, 209 S.W.3d 602, 616 (Tenn. Ct. App. 2006).

We review a trial court's decisions on the attorney-client privilege "using the abuse of discretion standard." *Pagliara*, 614 S.W.3d at 89. Even if the court erred, its decisions are subject to the harmless error doctrine. *See Blaylock & Brown Constr., Inc. v. AIU Ins. Co.*, 796 S.W.2d 146, 155 (Tenn. Ct. App. 1990). To warrant reversal, the error must have "involv[ed] a substantial right" and "more probably than not affected the judgment." TENN. R. APP. P. 36(b); *see* TENN. R. EVID. 103 (providing that an evidentiary error must affect "a substantial right of the [complaining] party"). In other words, the error must have resulted in prejudice to the complaining party. *See Wallace v. Knoxville's Cmty. Dev. Corp.*, 568 S.W.2d 107, 112 (Tenn. Ct. App. 1978). And the complaining party has the burden to show prejudice. *Bishop v. R.E.B. Equip. Serv., Inc.*, 735 S.W.2d 449, 451 (Tenn. Ct. App. 1987).

Here, Defendants contend that attorney Marchetti's testimony "goes directly to the heart" of the implied-partnership issue. As explained above, Defendants have not adequately shown that issue's relevance here. They argue that Mr. Marchetti's excluded testimony was about Nashville Ready Mix's use of Meadows Excavating's assets and employees. But Defendants' expert, Mr. Swafford, testified about those issues and how, in his opinion, they affected the capital accounts. Mr. Marchetti's proffered testimony did not shed new light on these issues. And excluding cumulative evidence is harmless error. *See City of Kingsport v. Lane*, 243 S.W.2d 289, 293 (Tenn. Ct. App. 1951) (finding that exclusion of testimony was not error where testimony "would have been cumulative"); *cf. Wilkerson v. Altizer*, 845 S.W.2d 744, 747 (Tenn. Ct. App. 1992) ("The improper introduction of testimony which is cumulative or otherwise established by evidence in the record is harmless error."). Defendants have not met their burden to show how the trial court's privilege rulings prejudiced them.

C.

A trial court "may direct" a special master "to do or perform particular acts." TENN. R. CIV. P. 53.02. The master shall then "prepare a report upon the matters submitted" to it. *Id.* 53.04(1). Here, the trial court appointed a receiver to help wind up and liquidate Meadows Excavating. *See* Tenn. Code Ann. § 48-249-619(a). Specifically, the court enlisted the receiver in disposing of the company's assets. *See id.* § 48-249-619(c)(1)(A). The receiver prepared a report finding that over 300 disputed assets belonged to Meadows

8

Excavating. So the receiver assumed the role of a special master. And the trial court agreed with the receiver's findings.

Generally, "concurrent findings by the master and the trial court have the same force and effect as a jury verdict." *In re Estate of Wallace*, 829 S.W.2d 696, 700 (Tenn. Ct. App. 1992). So the findings usually will "not be disturbed by the appellate courts." *Id.* But this general rule does not apply if (1) the issue should not have been referred to a master, (2) the findings are based on an error of law, (3) the findings involve a question of law or a mixed question of law and fact, or (4) the findings are not supported by substantial and material evidence. *Id.* Absent any of these circumstances, we do not "have the right to disturb" the concurrent findings. Tenn. Code Ann. § 27-1-113; *Staggs v. Herff Motor Co.*, 390 S.W.2d 245, 251 (Tenn. 1965); *Schoen v. J.C. Bradford & Co.*, 642 S.W.2d 420, 424 (Tenn. Ct. App. 1982).

In their concurrent findings, the receiver and trial court reasoned that the ostensible ownership act did not apply. The interpretation of statutes "and the application of a statute to the facts of a case" are questions of law, which we review de novo. *Tenn. Dep't of Corr. v. Pressley*, 528 S.W.3d 506, 512 (Tenn. 2017). So the concurrent findings involve a question of law. *See In re Estate of Wallace*, 829 S.W.2d at 700.

The ostensible ownership act provides that "[p]ossession of goods and chattels continued for five (5) years . . . shall, as to the creditors of the possessor or purchasers from the possessor, be deemed conclusive evidence that the absolute property is in such possessor." Tenn. Code Ann. § 66-3-103. Defendants argue that Don possessed the antique automobiles, heavy equipment, and some other items on his farm for over five years. So, now that Don is deceased, they claim that they are the conclusive owners of those items.

We conclude that the ostensible ownership act does not apply. *In re Hall*, 5 B.R. 120, 122 (Bankr. M.D. Tenn. 1980). It "was enacted for the benefit of creditors of the possessor of goods and chattels," not "for the benefit of the possessor." *O'Brien v. Waggoner*, 96 S.W.2d 170, 176 (Tenn. Ct. App. 1936); *see In re Hall*, 5 B.R. at 122 (explaining that the act "creates no rights in the possessor of the property but only in his creditors"). So it only protects "parties who ha[ve] advanced credit upon the showing of apparent ownership in a party in possession." *Thach v. Brown Knitting Co.*, 132 S.W.2d 228, 235 (Tenn. Ct. App. 1939).

Defendants, as Don's successors in interest, assert that Steve and Nashville Ready Mix are their creditors. But neither Steve nor Nashville Ready Mix advanced credit to Don on the basis of his possession of the items on his farm. *See id.* The items did not secure a debt owed by Don to Steve or Nashville Ready Mix. So the ostensible ownership act does not apply.

The receiver and trial court also rejected the applicability of a seven-factor test for vehicle ownership. *See Cunningham v. Dep't of Safety*, No. 01A01-9509-CH-00411, 1997 WL 266851, at *2 (Tenn. Ct. App. May 21, 1997). Defendants claim that the test applies and weighs in their favor. "The application of the law to the facts . . . is a question of law which [we] review[] de novo." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). So the receiver and court's concurrent findings also involve this question of law. *See In re Estate of Wallace*, 829 S.W.2d at 700.

Defendants do not articulate a meaningful argument regarding the seven-factor test. They merely recite the test and claim that "[a]pplication of these factors show[s] personal ownership of these Assets by Don Meadows, and now the Trust." Defendants have waived this argument by failing to construct one. *See Newcomb*, 222 S.W.3d at 401.

Besides the questions of law, Defendants argue that the receiver and trial court's concurrent findings were not supported by substantial and material evidence. *See In re Estate of Wallace*, 829 S.W.2d at 700. Substantial and material evidence is "'such relevant evidence as a reasonable mind might accept to support a rational conclusion' and to furnish a reasonably sound basis for the decision under consideration." *Smith v. White*, 538 S.W.3d 1, 10 (Tenn. Ct. App. 2017) (quoting *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. 2007)). It is "something less than a preponderance of the evidence, but more than a scintilla or glimmer." *Parker v. Shelby Cnty. Gov't Civil Serv. Merit Bd.*, 392 S.W.3d 603, 614 (Tenn. Ct. App. 2012) (citation omitted).

Here, the receiver and trial court relied on four days' worth of testimony from multiple witnesses in reaching their decision on the antique automobiles. They also considered cancelled checks, car competition entry forms, open titles, photographs, and an appraisal form. They relied on vehicle information, frame, and engine block numbers too. And they considered what prizes from car competitions showed about ownership. In light of all the evidence, there was a sound and rational basis for the concurrent findings. *See Smith*, 538 S.W.3d at 10. More than a scintilla of evidence supported the findings. *See Parker*, 392 S.W.3d at 614.

Defendants complain that vehicles with "no documentation found" were allocated to Meadows Excavating. But, as the trial court noted, there was "little information" to work with in that regard. And Defendants failed to provide more helpful documentary information. *See Ottarson v. Dobson & Johnson, Inc.*, 430 S.W.2d 873, 877 (Tenn. Ct. App. 1968) (reasoning that "the burden of proof is generally on the complainant"). The remaining evidence soundly supported the receiver and court's decision.

Defendants also argue that Steve failed to rebut the presumption of Don's ownership based on Don's possession of the items. *See Induction Techs., Inc. v. Justus*, 295 S.W.3d 264, 266 (Tenn. Ct. App. 2008) ("Generally speaking, 'a rebuttable presumption of ownership arises from possession of property.'" (citation omitted)). Assuming this

presumption applies, the evidence other than possession rebutted the presumption. Regardless, Don did not individually possess many of the items. Some of the vehicles were stored on the Baptist World Center property, which Don and Steve jointly owned. And the remaining vehicles and memorabilia, while on Don's farm, were stored in a museum and other buildings there. Nashville Ready Mix paid for those buildings.

D.

The trial court held a bench trial on the issue of capital accounts. Defendants claim that the court erred in failing to conduct an accounting for this issue. A request for an accounting is "left to the sound discretion of the trial court." *Huggins v. McKee*, 500 S.W.3d 360, 374 (Tenn. Ct. App. 2016). So we review a trial court's decision on such a request for an abuse of discretion. *Id.* An accounting is unnecessary where a party "ha[s] access to or the ability to access the financial records." *See id.* at 377-78.

The court did not err in declining to order an accounting. Here, Defendants had access to records related to the capital accounts. Mary Helen Meadows, Don's widow and co-trustee of the Meadows Community Property Trust, handled accounting for Meadows Excavating before Mr. Hinton did. So she had records such as bank statements. And Defendants' expert, Mr. Swafford, reviewed a warehouse full of financial records in preparation for trial.

After the bench trial, the court found that, based on the company's tax returns, Don's account had a $924,638 deficit. We review a trial court's findings of fact de novo on the record, with a presumption of correctness of the findings, unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d). We give "great weight" to findings based on credibility determinations. *King v. Anderson Cnty.*, 419 S.W.3d 232, 245-46 (Tenn. 2013). We "will not second-guess a trial court's credibility determinations without 'clear and convincing evidence to the contrary.'" *Id.* at 246 (quoting *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn. 2012)).

Defendants levy a variety of challenges to the tax returns and Mr. Hinton's testimony. They argue that he only considered the book value, not fair market value, of Don's initial capital contribution. And he determined Don's initial account balance with the cash-basis of accounting, which the IRS said was inappropriate after an audit. The tax returns also reflected "materially different" capital account figures than the company's financial statements.

The evidence does not preponderate against the court's finding that the tax returns were the "best evidence" of the capital accounts.[3] Defendants' challenges go to the weight

---

[3] This is so despite Defendants' complaint that years of tax returns and financial statements were not admitted into evidence. Importantly, they did not introduce such evidence. Relief is not available "to

of the evidence and credibility of witnesses.  "[I]t is neither the duty nor the privilege of the appellate court to weigh conflicting evidence or pass upon the credibility of witnesses." *Maddox v. Cone*, 1 Tenn. App. 534, 537 (1926).  Those issues are within the province of the trial court.  *See BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 137 (Tenn. 2001).  And the court resolved the conflicting evidence in favor of Steve and accredited Mr. Hinton's testimony.  We will not disturb these findings on this record. *See King*, 419 S.W.3d at 246.

Defendants also argue that the court ignored the operating agreement, which stated that Don and Steve made equal capital contributions.  But there must be evidence to support what an operating agreement states about members' capital contributions.  *See Huggins*, 500 S.W.3d at 370-71.  And here, contrary to the operating agreement, Mr. Hinton testified that Don and Steve did not "contribute[] equal amounts."  His accredited testimony showed discrepancies between their capital accounts over the years.

Defendants lastly contend that the court erred in failing to recognize credits to Don's account.  In their view, the account deserved credit because Nashville Ready Mix used Meadows Excavating's trucks, equipment, and employees beginning around 2002. Meanwhile, depreciation of those assets remained with Meadows Excavating, which decreased Don's account balance.  But the trial court found that "there was no proof" of how this affected the capital accounts.  The evidence does not preponderate against that finding.  Mr. Swafford did not explain what or how much of an impact it had.

Defendants also sought credit to Don's account for his payment of living expenses for Steve and his wife early in their marriage.  Mr. Swafford opined that it affected Don's account.  But, again, he did not explain how or provide any numbers.

The evidence does not preponderate against the trial court's finding that Don's capital account had a deficit of $924,638.  We agree with the court that Defendants "failed to present any sustainable basis for this number to be questioned" or to recognize any credits to the account.

## III.

Defendants did not show any relevant impact of the decisions in the separate lawsuit here.  Nor did they prove that the trial court's privilege rulings prejudiced them.  We also find no basis to disturb the receiver and court's concurrent findings on the ownership of

---

a party responsible for an error or who failed to take whatever action was reasonably available to prevent . . . [the] error."  TENN. R. APP. P. 36(a); *see Godbee v. Dimick*, 213 S.W.3d 865, 897 (Tenn. Ct. App. 2006) (reasoning that a party cannot "take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect" (citation omitted)).

assets.  And the evidence does not preponderate against the court's findings as to the capital accounts.  So we affirm.


                                               _____s/ W. Neal McBrayer_____
                                               W. NEAL MCBRAYER, JUDGE